UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11611-GAO

THOMAS E. PEREZ, Secretary of Labor,
United States Department of Labor,
Plaintiff,

v.

N. TERRY FAYAD, D.M.D., P.C., and
N. TERRY FAYAD, D.M.D., INDIVIDUALLY,
Defendants.

FINDINGS OF FACT, CONCLUSIONS
OF LAW, AND ORDER FOR JUDGMENT
March 31, 2015

O'TOOLE, D.J.

This action, brought by the Secretary of Labor under section 11(c) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et. seq.*, was heard on a bench trial before this Court. The parties subsequently filed proposed findings of fact and conclusions of law. Having reviewed those proposals and the evidence at trial, I find and decide as follows.

I. **Findings of Fact**

I make the following findings of fact:

Defendant Dr. N. Terry Fayad, D.M.D., P.C. operated a dental practice in Beverly, Massachusetts. Defendant Dr. N. Terry Fayad, D.M.D, as an individual, owns, operates, and leads the practice. Fayad's wife, Laura Mancini, was the office manager for the practice. Mancini had the authority to discipline, hire, and fire employees.

In 2010, the defendants also employed two hygienists, Robyn Demand and Michele Philips, and one dental assistant, complainant Rhonda Healey. Demand left her employment with the defendants in 2011. Philips remained employed by the defendants at the time of trial.

As a dental assistant, Healey's duties included preparing operatories, breaking down and handling used instruments, sterilizing instruments, and cleaning up certain items, including sharps such as needles, after completion of dental treatments. At the office she had primary responsibility for disposing of used, contaminated needles. Fayad supervised the clinical-related work; Mancini supervised the administrative part of Healey's work. Fayad and Mancini felt Healey was good at her job. They had an excellent relationship with Healey and testified that they all were like family. When Healey began working for the practice in 2002, she was paid $20 an hour. By November 2010, she was being paid $27 an hour. Healey participated in a profit sharing plan while she was employed by the defendants.

During her employment, Healey often assisted Fayad one-on-one with his various dental procedures. These procedures often required the use of anesthetic needles, for which precautions were implemented to avoid risk of exposure after contamination. One end of the needle was inserted into a carpule, a small glass cylinder containing anesthetic solution for patient procedures; the other end of the needle was placed into a patient's gum tissue during the procedure. After the needle was used, a plastic cap would be placed on the patient end of the needle. The contaminated needle would then be removed from the carpule and discarded in a dedicated sharps disposal container. Needle removal requires turning, pulling, and other manipulation of a contaminated needle. Fayad acknowledged that it was standard protocol in the dental industry to discard the contaminated needle in the sharps container with the cap still on.

Until October 2010, the practice had a policy of disposing of the contaminated needle without the carpule but with the cap still attached. This disposal method created more waste in the sharps container than it would if needles were discarded without the caps. In October 2010, Fayad decided to change the policy in order to decrease the rate at which the sharps containers were filled and therefore needed to be emptied. This was a purely practical decision; it had no medical purpose. Fayad developed one or more methods of removing the cap from the contaminated needle using hemostats (tong-or forceps-like instruments) so that only the needle was discarded in the sharps container. He demonstrated the method(s) to his staff.

Healey returned to work from a brief maternity leave on November 15, 2010. Fayad and Mancini were pleased to have her back. That day, Fayad demonstrated to Healey the new needle disposal method he had developed. Healey understood that she was supposed to use her hands to manipulate the needle, without a hemostat, although Fayad denies that he taught her this way. In the past, Fayad and Healey had used their hands when doing the standard protocol for needle disposal (disposing with a cap). Healey did not communicate to Fayad any discomfort or objection to the new method at that time or during the two following days, November 16 and 17. However, she expressed concern to Demand about its safety. She also did not follow the new procedure but continued discarding needles with caps as she had previously done. On the evening of November 17, Fayad and Mancini discovered that someone had been discarding needles with caps and suspected it was Healey.

On the morning of Thursday, November 18, Fayad asked Healey whether she had been following the new method. She told him that she had not because she felt uncomfortable about it. Fayad said that the needles in the sharps containers had to be uncapped. Healey interpreted this

3

to mean that not only must she uncap contaminated needles moving forward, but she must also reach into the sharps containers and uncap those that were already discarded. Fayad did not understand this was her interpretation and has been adamant that he would never ask her to reach into a sharps container.

Fayad suggested that they should speak with Mancini about her concerns. When Healey told Mancini that she was uncomfortable handling the needles, Mancini responded that it was part of Healey's job.

The evidence is conflicting about the details of the conversation between Healey and Mancini, but I find that Healey left the office after the conversation that morning without notice to either Fayad or Mancini. Fayad and Mancini discovered she had left some time afterward and treated her departure as an unacceptable abandonment of her work.

I do not find that Healey abandoned her employment when she left the office in the sense that it was effectively a resignation. I find that she left in a state of upset, with some concern or uncertainty about how her supervisors looked upon her, but without the understanding either that she was quitting or had been terminated. I find simply that there was no clear termination of her employment on November 18 – or 19, 20, or 21 – and that Healey's status with respect to her employment was in flux.

Sometime after leaving the office on November 18, Healey spoke with an OSHA industrial hygienist, Angela Sciandra, who is responsible for investigating health and safety issues. Healey also spoke with whistleblower investigator Anthony Maida. Healey filed both a Safety and Health and a Section 11(c) Whistleblower complaint on November 18.

On the morning of Friday, November 19, Mancini contacted the Everest Institute, which runs a dental externship program, to see whether an extern would be available to assist the practice.

Healey called the dental office on Friday afternoon, November 19. Although the office was closed that day, she believed a voice message would still reach Fayad and/or Mancini. She left a voice message which contained at least the following: "Hi, Dr. Fayad. This is Rhonda. I just wanted to find out my status – if I still have a job or not. And I'm willing to come back if you change your policy on the capping the needles, or uncapping the needles. Just give me a call . . . to let me know where I stand; if I still have a job or not. Thank you." Fayad and Mancini listened to the message that day. They decided to call Healey back on Monday.

Over the weekend of November 20 and 21, Fayad and Mancini sought advice from Mancini's sister, Dana Capodilupo, who had experience in human resources. Capodilupo recommended Mancini go over the timeline of events with Healey with respect to the new method, and she prepared a short script for Mancini to use.

Also over the weekend, Fayad developed a new method of performing needle uncapping, called the notch method, whereby the notch of the sharps container was used to manipulate one end of the needle and remove the cap. The Secretary maintains this was developed as an accommodation to Healey; the defendants maintain it was simply a new method the staff would be able to use moving forward, should they choose.

On Monday, November 22, Mancini and Healey spoke by phone. There is considerable dispute concerning the substance of this call. The Secretary asserts that Mancini attempted to accommodate Healey and told her there was another method of uncapping available. The

defendants maintain that Mancini confirmed that Healey was not welcome back at the office and no longer had a job there. The facts are inconclusive as to the substance of the call. I find that there was no unambiguous termination of the employment relationship and that Healey expected she would hear further from Fayad and/or Mancini either as to her employment status generally or, more specifically, as to when she should come back to the office to learn the new method. That evening, Healey told Demand that Mancini wanted her to come into the office so Fayad could show her a new method, suggesting Healey believed her employment was still active.

On Tuesday, November 23 at approximately 10:30 a.m., OSHA Compliance Officer John Nesbitt arrived at the dental office to conduct a safety and health inspection. Nesbitt was assigned the case a few days prior and had spoken with Sciandra, who relayed some information from her call with Healey. There is a dispute about what Nesbitt was told by Fayad and Mancini during his visit. Nesbitt's own contemporaneous notes indicate that he spoke with Mancini and Fayad for background information concerning the office and its employees and that Healey was described by them as an "employee" on three occasions (as an assistant, as the practice's OSHA compliance employee, and as an employee who had attended an OSHA training). On a fourth occasion – after he had shown them the anonymous complaint and they had identified Healey as the complainant and proceeded to explain the dispute over the needles – Nesbitt's notes indicate that Fayad and Mancini described Healey's employment status as "not resolved." Nesbitt left the office around 2:15 p.m.

At 2:44 p.m. on November 23, Healey left a message at the office asking Mancini to call her back. At 3:11 p.m., Mancini returned Healey's call. Again, there is a dispute about the substance of this call. Both parties, however, agree that the call was short and that at the end it

was clear that Healey was no longer employed by the practice. Because I find that Healey's employment status was in flux until then, I find this call was the occasion of her termination. Specifically, I find that Mancini flatly told Healey she was no longer employed. Mancini's call terminating Healey's employment came within an hour of the OSHA investigator's completion of his surprise visit to the office.

Healey called Maida, the OSHA whistleblower investigator, after the November 23 call in which Mancini terminated her employment. On December 2, Maida informed the defendants that Healey had filed a retaliation claim. The defendants began processing Healey's COBRA and pension paperwork that day but never issued her a termination letter.

Healey's emotional state unraveled after her termination. On December 9, the defendants began surveillance of Healey through a private investigator, which continued for over one and a half years.

Healey filed for unemployment benefits on November 26, 2010. The defendants contested Healey's benefits claim. Healey filed for food stamps sometime after her employment with the defendants terminated and began looking for work. Healey performed work for Dano Dental Arts for some period beginning in March 2011. She performed part-time work at Red Rock Dental for some period beginning in June 2011.

On April 25, 2011, OSHA issued Fayad, P.C. a number of citations for violations of OSHA safety and health regulations, including citations for the notch method and for failing to adequately train employees on OSHA's Blood Borne Pathogens Standard. Fayad, P.C. settled the violations, paid a penalty, and abated the notch procedure and training violations.

7

## II. Conclusions of Law

Based on these factual findings, I make the following conclusions of law:

### A. Retaliatory Discharge under Section 11(c)

Section 11(c)(1) of the Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* (the "Act"), provides:

> No person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this [Act] or has testified or is about to testify in any such proceeding or because of the exercise by such employee on behalf of himself or others of any right afforded by this chapter.

29 U.S.C. § 660(c)(1); 29 C.F.R. 1977.3. The Secretary has established a prima facie case under section 11(c). Healey engaged in a protected activity under the Act when she filed a safety and health complaint on November 18, 2010. See 29 C.F.R. § 1977.9 ("Discharge of, or discrimination against, an employee because the employee has filed any complaint under or related to this Act is prohibited by section 11(c)"). The defendants only discovered that Healey had filed a complaint when Nesbitt conducted the OSHA inspection on November 23, 2010. They fired her within an hour of his leaving. Given the timing, I find that Healey's discharge shortly after her employer's discovery of the complaint was a retaliatory discharge in violation of section 11(c) of the Act.

The defendants purport to present a legitimate, non-discriminatory reason for Healey's termination, claiming that she was fired for leaving the office during a full patient schedule and thus breaching their trust. This reason is not believable in light of all the evidence presented at trial. The evidence showed that Healey worked for the defendants for almost a decade, that Fayad and Mancini treated her like family, and that Fayad was "ecstatic" when she returned from

8

maternity leave. That this relationship would be broken beyond repair by Healey's departure on November 18 is not credible. Instead, it is credible that such a relationship would have been broken when Healey took her complaint to OSHA. The evidence is convincing that this action was regarded by Fayad as a breach of trust that caused the termination of her employment, precisely the protected activity that makes this a retaliatory discharge. I am persuaded that the defendants' stated reason is merely pretextual. Accordingly, I conclude that Healey was discharged in retaliation for filing a complaint with OSHA, which is a clear violation of section 11(c) of the Act.

I do not reach the question of whether Healey's actions on November 18, 2010 constituted a justified work refusal and do not find that the defendants committed an act of discrimination in violation of section 11(c). Neither do I conclude that Healey was constructively discharged in violation of section 11(c) that day. Because I do not find that Healey was discharged until November 23, 2010, I likewise do not conclude that the defendants' actions on November 22 and 23, 2010 constituted a retaliatory refusal to rehire in violation of that section.

B. Damages

The Secretary is entitled to damages, to be awarded to Healey, in the form of back wages for the period of November 23, 2010 through December 31, 2011, which I previously determined to be the furthest date the back wages claim would likely reach (see Final Pretrial Conf. Tr. 10 (dkt. no. 158)), totaling $51,644.80, which I calculate by subtracting wages for November 18 and 22, 2010 from the Secretary's proposal, consistent with my finding that Healey was not terminated until November 23. I award compensatory damages with respect to the profit sharing plan losses through 2011 in the amount of $13,450.26, as testified to at trial by the Secretary's

9

witness Michael Mabee, as well as for emotional damages in the amount of $20,000, for a total of $33,450.26. I do not award punitive damages because I do not find the conduct at issue to be unusually reprehensible, beyond what any retaliatory discharge must be. See <u>State Farm Mut. Auto. Ins. Co. v. Campbell</u>, 538 U.S. 408, 419 (2003). Finally, I do not find Fayad individually liable for back wages. The parties do not dispute that he can be held liable for compensatory damages.

### C. Other Relief

I enjoin the defendants, including Fayad in his personal capacity, and their agents, servants, and employees from violating the provisions of section 11(c) of the Act. I direct the defendants to post a notice to their employees stating that the defendants will not in any way discriminate against employees for activities protected by the Act.

## III. Order

Judgment shall enter accordingly.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge